# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

OREGON NATURAL DESERT
ASSOCIATION; COMMITTEE FOR THE
HIGH DESERT; WESTERN
WATERSHEDS PROJECT,
          *Plaintiffs-Appellants,*

                v.

BUREAU OF LAND MANAGEMENT;
ELAINE M. BRONG, State Director,
Oregon/Washington BLM; TOM
DABBS, Field Manager, Malheur
Resource Area, BLM; JERRY
TAYLOR, Field Manager, Jordan
Resource Area, BLM,
          *Defendants-Appellees.*

No. 05-35931

D.C. No.
CV-03-01017-JJ

ORDER AND
AMENDED
OPINION

Appeal from the United States District Court
for the District of Oregon
Anna J. Brown, District Judge, Presiding

Argued and Submitted
November 8, 2007—Portland, Oregon

Filed July 14, 2008
Amended August 31, 2010

Before: Raymond C. Fisher and Marsha S. Berzon,
Circuit Judges, and Judith M. Barzilay, Judge.*

Opinion by Judge Berzon

*The Honorable Judith M. Barzilay, Judge, United States Court of
International Trade, sitting by designation.

## COUNSEL

Peter M. "Mac" Lacy (argued), of the Oregon Natural Desert Association, Portland, Oregon, Laurence J. "Laird" Lucas, Boise, Idaho, and Stephanie M. Parent, of the Pacific Environmental Advocacy Center, Portland, Oregon, for the plaintiffs-appellants.

David Shilton (argued), Todd S. Aagard, Matthew J. Sanders, and Sue Ellen Wooldridge, of the U.S. Department of Justice, Washington, DC, Karen J. Immergut, and Stephen J. Odell, of the U.S. Attorney of Oregon, Portland, Oregon, and Mariel J. Combs, of the U.S. Department of the Interior, Office of the Regional Solicitor, Portland, Oregon, for the defendants-appellees.

## ORDER

The parties' Joint Motion Requesting Amendment of Opinion and Remand is GRANTED. Although motions to amend substantial portions of opinions by incorporating specific language proposed by parties as part of a settlement are disfavored and will rarely be granted, in this instance the panel has determined, after careful review, that the proposed amendment fully conforms to Ninth Circuit and United States Supreme Court law regarding the relief accorded in a NEPA case and would be appropriate relief if requested by the plaintiff independently. In light of this disposition, the appellees' Petition for Rehearing is denied as moot.

The opinion of the Court in this case, *Oregon Natural Desert Association v. Bureau of Land Management*, 531 F.3d 1114 (9th Cir. 2008), is amended as follows:

In the second paragraph of the opinion, 531 F.3d at 1116, replace the last sentence of that paragraph with the following:

We reverse and remand to the district court for further proceedings.

In Section II.B.5 of the Court's opinion, 531 F.3d at 1143, replace the last paragraph of that section with the following:

> BLM must address in some manner in its revised EIS whether, and to what extent, wilderness values are now present in the planning area outside of existing WSAs and, if so, how the Plan should treat land with such values. We prescribe no particular methodology for that consideration. The BLM must, however, do more than simply assert that it need not consider wilderness values because of the completion of the § 1782 process, as it did in the present EIS. We therefore remand to the district court.

In Section III of the Court's opinion, 531 F.3d at 1145, replace the existing two paragraphs with the following single paragraph:

> The EIS violated NEPA in the ways we have stated. Having addressed the problems we have identified, the BLM may decide to make different choices. NEPA is not a paper exercise, and new analyses may point in new directions. As a result, although ONDA also raises concerns regarding alleged substantive and procedural flaws within the Plan, we do not reach those issues today. The problems it identifies may never arise once the BLM has had a chance to see the choices before it with fresh eyes.

> **REVERSED and REMANDED.**

IT IS SO ORDERED.

**OPINION**

BERZON, Circuit Judge:

The Bureau of Land Management (the "BLM" or the "Bureau") is charged with managing "the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people." 43 U.S.C. § 1702(c); *see also id.* § 1712(a), (c). That task, which the Supreme Court has characterized as "enormously complicated," *Norton v. Southern Utah Wilderness Alliance* ("*SUWA*"), 542 U.S. 55, 58 (2004), requires careful planning.

The issue in this case is whether the BLM complied with the requirements of the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, when it developed a land use plan covering a large portion of Oregon. The Oregon Natural Desert Association, Committee for the High Desert, and Western Watersheds Project (collectively "ONDA") contend that the BLM has not done so because it has failed (1) properly to analyze the effects of the plan on lands under its control possessing "wilderness characteristics"; and (2) properly to analyze management options for grazing and off-road vehicle use throughout the region covered by the plan. The district court granted summary judgment for the BLM. We reverse and remand to the district court for further proceedings.

## I. Background

### A. The Physical and Legal Landscape

#### 1. Southeastern Oregon

The BLM-managed land at issue (which we will sometimes refer to as the "planning area") spreads over roughly four and a half million acres of rugged, remote land in southeastern

Oregon's Malheur, Grant, and Harney Counties. These lands lie in the rain shadow of the Cascade and Coastal ranges, and so are sunny and semi-arid. The sagebrush plains that characterize the region are varied by high mountains, rising to over 8,000 feet, and by the valleys of the Malheur and Owyhee rivers.

A similar landscape (not at issue in this appeal) extends into Idaho to the west. We have described that region, in terms equally applicable to the Oregon lands, as "[s]tartling in its ecological diversity, from arid sagebrush desert to lush juniper woodlands," and as including "spectacular and wild canyonlands" along the Owyhee river. *Idaho Watersheds Project v. Hahn*, 307 F.3d 815, 821 (9th Cir. 2002).

It is not simply the landscape that marks the planning area. The area is also home to tens of thousands of people who live and work in this dry and demanding territory. European settlement of the region began as immigrants moved west over the Oregon Trail and intensified with the discovery of gold in the Owyhee Mountains in the 1860s, bringing miners and ranchers into the landscape. Today, about 30,000 people live in Malheur County, which makes up the bulk of the planning area. Although the service and outdoor recreation industries are growing significantly, farming and ranching still drive the economy. The old mines are largely tapped out and do not employ many people, and portions of the range were degraded in the early years of settlement. These days, Malheur County's economic indicators are significantly below statewide averages for Oregon, and a sizable portion of the population is below the poverty line.

Federally owned land makes up a large portion of the region, giving the BLM an important role. Its land use planning choices influence both the unique and irreplaceable natural resources of the planning area and the local economy, which is strongly tied to the outdoors. The choices available to the BLM are governed in large part by three statutes of cen-

tral relevance to this appeal: the Federal Land Policy and Management Act, the Wilderness Act, and the National Environmental Policy Act. We discuss each statute in turn.

## 2.   Federal Land Management

### a.   The Federal Land Policy and Management Act

The BLM's land management authority is defined by the Federal Land Policy and Management Act of 1976 (the "FLPMA"), 43 U.S.C. §§ 1701 *et seq.* Although the BLM existed before the passage of the FLPMA, *see* 43 U.S.C. § 1731(a), its role was extensively revised by that statute, which, among other changes, establishes systems for information gathering and land use planning.

The FLPMA directs that the Secretary of the Interior, who oversees the BLM, "shall, with public involvement . . . , develop, maintain, and, when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands." *Id.* § 1712(a); *see also SUWA*, 542 U.S. at 58-60 (describing the land use planning process).[1] Among other requirements, these plans are to "use and observe the principles of multiple use and sustained yield";[2] "use a systematic

---

[1]The BLM sometimes refers to these plans as "resource management plans." 43 C.F.R. § 1601.0-1. We use "land use plan" and "resource management plan" interchangeably.

[2]"Multiple use" and "sustained yield" are both technical terms. "The term 'sustained yield' means the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use." 43 U.S.C. § 1702(h). Multiple use, in turn, is defined to mean:

> [T]he management of the public lands and their various resource values so that they are utilized in the combination that will best meet the present and future needs of the American people; making the most judicious use of the land for some or all of these resources or related services over areas large enough to provide sufficient latitude for periodic adjustments in use to conform to

interdisciplinary approach"; "give priority to the designation and protection of areas of critical environmental concern"; and "weigh long-term benefits to the public against short-term benefits." 43 U.S.C. § 1712(c). The BLM "shall manage the public lands" in accordance with these plans. *Id.* § 1732(a).

To ensure that the BLM has adequate information to perform this task, the FLPMA also directs that:

> The Secretary shall prepare and maintain on a continuing basis an inventory of all public lands and their resource and other values (including, but not limited to, outdoor recreation and scenic values), giving priority to areas of critical environmental concern. This inventory shall be kept current so as to reflect changes in conditions and to identify new and emerging resource and other values.

*Id.* § 1711(a). The BLM, in other words, is obligated to "arrange for resource, environmental, social, economic and institutional data and information to be collected, or assembled if already available." 43 C.F.R. § 1610.4-3. The Bureau is, in particular, to collect "[n]ew information and inventory data [that] will emphasize significant issues and decisions with the

---

changing needs and conditions; the use of some land for less than all of the resources; a combination of balanced and diverse resource uses that takes into account the long-term needs of future generations for renewable and nonrenewable resources, including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values; and harmonious and coordinated management of the various resources without permanent impairment of the productivity of the land and the quality of the environment with consideration being given to the relative values of the resources and not necessarily to the combination of uses that will give the greatest economic return or the greatest unit output.

*Id.* § 1702(c).

greatest potential impact." *Id.* Land use plans are to "rely, to the extent it is available, on the inventory of the public lands, their resources, and other values." 43 U.S.C. § 1712(c)(4). An extensive public comment process also provides information for the formulation of BLM land use plans. *See* 43 C.F.R. § 1610.2 (discussing public participation).

The land use plans thus developed guide "[a]ll future resource management authorizations and actions . . . and subsequent more detailed or specific planning, shall conform to the approved plan[s]." *Id.* § 1610.5-3. After a land use plan is approved, "[a]ny person who participated in the planning process and has an interest which is or may be adversely affected by the approval or amendment of a resource management plan may protest such approval or amendment." *Id.* § 1610.5-2(a). Once the Director of the BLM has ruled on any protest, the decision is final and the plan may be adopted. *Id.* § 1610.5-2(a)(3), (b).

### b.   The Wilderness Act and the FLPMA

Among the resources to be managed on federal lands, lands with statutorily-defined wilderness characteristics are of particular importance. Congress identified the conservation of such lands as a national priority in the Wilderness Act of 1964 (the "Wilderness Act"), 16 U.S.C. §§ 1131 *et seq. See also Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1055-56 (9th Cir. 2003) (en banc) (describing the passage of the Wilderness Act). The FLPMA, which was enacted later, interacts with the Wilderness Act to provide the BLM with broad authority to manage areas with wilderness characteristics contained in the federally owned land parcels the Bureau oversees, including by recommending these areas for permanent congressional protection.

The Wilderness Act is intended to "assure that an increasing population, accompanied by expanding settlement and growing mechanization, does not occupy and modify all areas

within the United States and its possessions, leaving no lands designated for preservation and protection in their natural condition." 16 U.S.C. § 1131(a). A "wilderness" is defined, "in contrast with those areas where man and his own works dominate the landscape," as:

> an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this chapter an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value.

*Id.* § 1131(c).

The Wilderness Act did not directly address the BLM's management of its lands. The FLPMA remedied this deficiency by providing specifically for a review of wilderness resources on BLM lands, *see* 43 U.S.C. § 1782, and by ensuring that lands with wilderness characteristics are regularly inventoried for use in land use planning.

First, the FLPMA provides in pertinent part that:

> Within fifteen years after October 21, 1976, the Secretary shall review those roadless areas of five thou-

sand acres or more and roadless islands of the public lands, identified during the inventory required by [43 U.S.C.] § 1711(a) . . . as having wilderness characteristics described in the Wilderness Act . . . and shall from time to time report to the President his recommendation as to the suitability or nonsuitability of each such area or island for preservation as wilderness . . .

*Id.* § 1782(a). Upon such a recommendation, the President is to advise Congress "of his recommendations with respect to designation as wilderness of each [agency-recommended] area," and Congress may then act to "designat[e] as wilderness" the lands it deems appropriate. *Id.* § 1782(b); *see also SUWA*, 542 U.S. at 58 (explaining that "Congress made the judgment that some lands should be set aside as wilderness . . ."); *Smith v. U.S. Forest Serv.*, 33 F.3d 1072, 1073 (9th Cir. 1994) (stating that "[t]he areas ultimately granted wilderness status by Congress must, by law, remain protected and free from development."); 43 C.F.R. § 6302.11 (explaining that wilderness areas will generally only be "open to uses consistent with the preservation of their wilderness character and their future use and enjoyment as wilderness").[3] In the interim period between the BLM's review of lands "identified during the inventory . . . as having wilderness characteristics" and Congress's final preservation decision, the BLM must, with a few exceptions not relevant here, manage all the lands it has reviewed "so as not to impair the suitability of such areas for preservation as wilderness," whether or not it believes them to be suitable for such preservation. 43 U.S.C. § 1782(c). The recommended lands, managed under this "non-impairment" standard, are referred to as "wilderness study areas" ("WSAs"). *See SUWA*, 542 U.S. at 59.

---

[3]Because such congressional action provides for "the protection of these areas [and] the preservation of their wilderness character," 16 U.S.C. § 1131(a), we sometimes refer in this opinion to the final congressional wilderness designation as "preservation" or "protection."

Importantly, although 43 U.S.C. § 1782 provides a mechanism by which the BLM may submit lands to Congress for legislation preserving them, the BLM's authority to identify lands with "wilderness characteristics" is not limited to the § 1782 process. Rather, as § 1782 makes clear, it is the 43 U.S.C. § 1711(a) general resource inventory process, which catalogues "all public lands and their resource and other values," *id.*, that is to identify lands "as having wilderness characteristics described in the Wilderness Act." *Id.* § 1782(a); *see also Sierra Club v. Watt*, 608 F. Supp. 305, 309-10 (C.D. Cal. 1985) (describing the "inventory preparation requirement of [§ 1711]" as the first step in the wilderness review and designation process of § 1782); *Wilderness Soc'y*, 119 I.B.L.A. 168, 170-72 (1991) (discussing the wilderness process as occurring under both §§ 1711 and 1782). In other words, wilderness characteristics are among the "resource and other values" of the public lands to be inventoried under § 1711.[4] The BLM's land use plans, which provide for the management of these resources and values, are, again, to "rely, to the extent it is available, on the inventory of the public lands, their resources, and other values." 43 U.S.C. § 1712(c)(4).

---

[4]The use of the term "resource and other values" warrants a brief note. Section 1711 appears to suppose that the public lands have both resource values and "other" values, which it parenthetically notes include, but are not limited to, "outdoor recreation and scenic values," and which also apparently include "areas of critical environmental concern." Elsewhere in the statute, however, 43 U.S.C. § 1702(c), which defines multiple-use management, speaks of public land "resources," which, it adds, include, but are not limited to, "recreation . . . and natural scenic, scientific and historical values." As the "resources" referred to in § 1702(c) include "other values" referred to in § 1711, there does not appear to be a meaningful statutory distinction between "resources," "resource values," and "other values" — or at least not one of relevance here, given that § 1702(c) also refers to managing "the relative values of the resources" it identifies. Wilderness characteristics seem to be most accurately characterized as "other" values like "outdoor recreation and scenic values." We will therefore refer to "wilderness values," rather than a "wilderness resource," or "wilderness resource values."

We discuss the significance of the FLPMA's recognition of wilderness characteristics as an "other value" to be inventoried under § 1711 and managed under § 1712 at length below.

### c. The National Environmental Policy Act

"Approval of a resource management plan is considered a major Federal action significantly affecting the quality of the human environment." 43 C.F.R. § 1601.0-6. For that reason, the land use planning process implicates the third major statute we address today, NEPA, which requires the preparation of an environmental impact statement ("EIS") for such actions. *See* 42 U.S.C. § 4332(C).

In NEPA, Congress declared as a national policy "creat[ing] and maintain[ing] conditions under which man and nature can exist in productive harmony." *Id.* § 4331(a). NEPA's purpose is realized not through substantive mandates but through the creation of a democratic decisionmaking structure that, although strictly procedural, is "almost certain to affect the agency's substantive decision[s]." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *see also Churchill County v. Norton*, 276 F.3d 1060, 1072-73 (9th Cir. 2001) (describing NEPA's theory of democratic decisionmaking). By requiring the consideration of environmental factors in the course of agency decisionmaking on major federal actions, NEPA serves two purposes:

> First, "it ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." Second, it "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."

*Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 768 (2004) (quoting *Methow Valley*, 490 U.S. at 349) (internal citations

and alteration omitted). In other words, by requiring agencies to take a "hard look" at how the choices before them affect the environment, and then to place their data and conclusions before the public, *see Or. Natural Res. Council Fund v. Goodman*, 505 F.3d 884, 889 (9th Cir. 2007), NEPA relies upon democratic processes to ensure — as the first appellate court to construe the statute in detail put it — that "the most intelligent, optimally beneficial decision will ultimately be made." *Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1114 (D.C. Cir. 1971). "NEPA's purpose is not to generate paperwork — even excellent paperwork — but to foster excellent action." 40 C.F.R. § 1500.1(c).

As "public scrutiny [is] essential to implementing NEPA," *id.* § 1500.1(b), "[a]n agency preparing a final [EIS] shall assess and consider comments both individually and collectively, and shall respond . . . , stating its response in the final statement." *Id.* § 1503.4(a). Responses may include "[d]evelop[ing] and evaluat[ing] alternatives not previously given serious consideration by the agency" and "[s]upplement[ing], improv[ing], or modify[ing] its analyses." *Id.* If an agency opts not to make changes, it must, at least, "[e]xplain why the comments do not warrant further agency response, citing the sources, authorities, or reasons which support the agency's position." *Id.* § 1503.4(a)(5).

Because NEPA " 'simply guarantees a particular procedure,' " rather than a substantive result, we have characterized the rights and obligations it creates as "fundamentally unlike" those of substantive land management statutes like the FLPMA. *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1070-71 (9th Cir. 2002) (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998)); *see also Methow Valley*, 490 U.S. at 350-51 (discussing NEPA's procedural focus). Nonetheless, the statute remains "the broadest and perhaps most important" of the environmental statutes. *Calvert Cliffs*, 449 F.2d at 1111.

The EIS is NEPA's chief tool, designed as an "action-forcing device to [e]nsure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government." 40 C.F.R. § 1502.1. To fulfill its purpose, an EIS must "provide full and fair discussion of significant environmental impacts and shall inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." *Id.*; *see also* 42 U.S.C. § 4332(C) (enumerating EIS requirements). To fulfill this mandate, agencies must "consider every significant aspect of the environmental impact of a proposed action" in an EIS, *Pit River Tribe v. U.S. Forest Serv.*, 469 F.3d 768, 781 (9th Cir. 2006) (quoting *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1153-54 (9th Cir. 2006)); *see also* 40 C.F.R. Pt. 1502 (discussing EIS requirements), including the direct, indirect, and cumulative impacts of the action. *See* 40 C.F.R. §§ 1508.7, 1508.8 (defining those terms).

As the EIS is intended to be used to guide decisionmaking, the alternatives analysis is naturally "the heart of the environmental impact statement." *Id.* § 1502.14. In that section, the agency must "[r]igorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated. *Id.* "The existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 868 (9th Cir. 2004) (quoting *Morongo Band of Mission Indians v. Fed. Aviation Admin.*, 161 F.3d 569, 575 (9th Cir. 1998)).

## B.   The BLM's Plans for Southeastern Oregon

With this background in mind, we turn to the BLM's planning process for southeastern Oregon.

We begin with the BLM's initial wilderness review of the region, which it conducted pursuant to 43 U.S.C. § 1782's

mandate to recommend WSAs to the President for permanent legislative preservation as wilderness. By November 1980, the BLM identified 32 WSAs in the planning area, covering slightly less than 1.3 million acres. A final EIS considering the BLM's recommendations was completed in 1989, and the BLM transmitted its recommendations to the President in October 1991. It advised permanent preservation for twenty-one of the WSAs. The report also identified about three thousand acres of land adjoining WSAs that could be acquired for preservation as wilderness. In 1992, the President submitted these recommendations, without change, to Congress, which has not yet acted upon them. The BLM has not since inventoried any lands in the planning area outside of the WSAs for wilderness characteristics.

In August 1995, the BLM, in accordance with its regulations, published a public notice that it would prepare a resource management plan for the region. *See* Intent to Prepare a Resource Management Plan for the Andrews, Malheur, and Jordan Resource Areas, Oregon, 60 Fed. Reg. 44,042 (Aug. 24, 1995); *see also* 43 C.F.R. § 1610.2(c) (providing for public notice when planning commences). The Southeastern Oregon Management Plan (the "Southeast Oregon Plan" or the "Plan") is intended to guide management of the area for the next twenty years. BUREAU OF LAND MGMT., U. S. DEP'T OF THE INTERIOR, PROPOSED SOUTHEASTERN OREGON RESOURCE MANAGEMENT PLAN AND FINAL ENVIRONMENTAL [IMPACT] STATEMENT ("FEIS") xii (2001). Some three years after initiating the planning process, the BLM announced that the draft Plan and an accompanying EIS were available for public comment.[5] *See* Notice of Availability of Draft Southeastern Oregon Resource Management Plan/Environmental Impact Statement, 63 Fed. Reg. 56,660 (Oct. 22, 1998). ONDA

---

[5]The BLM attempts, "wherever possible" to release a "proposed plan and related environmental impact statement [as] . . . a single document," 43 C.F.R. § 1601.0-6, and did so here. The draft EIS and final EIS were published as one document with the corresponding draft and final Plans.

reviewed the draft EIS and Plan, and then raised some concerns in a comment letter to the BLM.[6]

ONDA noted that it had been years since the BLM's last inventory of lands with wilderness characteristics and argued that the BLM should make certain its information was accurate before designing a management strategy for the region:

> The time has come for the agency to conduct a reinventory of [roadless] lands [in southeastern Oregon]. Such an inventory . . . should exclude those areas already designated as WSAs and focus instead on other lands that were overlooked or deemed ineligible during the first inventory.

> It is crucial that any wilderness re-inventory also assess newly acquired state and/or private inholdings. During BLM's original wilderness inventory, some potential WSAs were deemed ineligible due to management issues resulting from large private inholdings. In situations where these inholdings have since been acquired, BLM must reconsider the eligibility of those lands as WSAs. We are confident that the BLM may be able to identify additional lands that should be protected . . . .[7]

ONDA also contended that the draft EIS did not "evaluate a reasonable range of alternatives," particularly with regard to grazing, and did not adequately address cumulative impacts, again paying particular regard to grazing pressures. It also

---

[6]The Committee for the High Desert and the Western Watersheds Project did not join in this comment letter. In the discussion of the letter, consequently, "ONDA" refers only to the Oregon Natural Desert Association. Otherwise, "ONDA" refers to all three groups.

[7]As we discuss later, at the time of ONDA's letter, the BLM asserted authority to recommend new areas for permanent preservation, and for management as WSAs in the interim, but it does not presently take that position.

raised concerns regarding the draft Plan's treatment of off-road vehicles ("ORVs"), contending that the Plan left too much land open to that use, without considering more conservation-oriented management. Having reviewed these comments, along with dozens of others, the BLM made some modifications to its EIS and proposed Plan and issued both in final form in 2001. *See* Notice of Availability of Proposed Southeastern Oregon Resource Management Plan and Final Environmental Impact Statement; and Proposed Area of Critical Environmental Concern Designations, 66 Fed. Reg. 55,946 (Nov. 5, 2001). It is these documents that are at issue in this appeal.

We next describe the EIS's treatment of the wilderness, grazing, and ORV issues.

### 1.  Wilderness Issues

After receiving ONDA's comments on the draft EIS and Plan suggesting the need to give more attention to lands with wilderness characteristics, the Bureau wrote in the final EIS that:

> A global reinventory by BLM to address wilderness values within the planning area is outside the scope of this plan. In accordance with FLPMA, with substantial public input and review, BLM has completed its required evaluation and assessment of wilderness values on public lands with earlier planning efforts. The agency's wilderness recommendations in Oregon derived from those planning efforts have been submitted and are presently awaiting consideration by Congress.

FEIS, Vol. III at 105. BLM further explained that "[t]he wilderness process started in 1978, the Final EIS [for that process] was completed in 1989, with the Record of Decision, and recommendation of the Secretary of Interior [as to preser-

vation] submitted in October 1991].” FEIS, Vol. I at 12. The BLM therefore considered such issues as “[e]liminated from [d]etailed [s]tudy,” because further permanent wilderness preservation “hinge[d] on congressional actions.” *Id.* The EIS therefore did not consider the effects of the Plan on areas with wilderness characteristics not already designated as WSAs, nor analyze management options for the wilderness values in such areas.

As we noted earlier, in its 1991 wilderness report, the BLM identified roughly three thousand acres of land adjacent to WSAs that could be added to them. In the 2001 final EIS, the Bureau considered alternatives for protecting the “wilderness characteristics” of this limited additional area. *See* FEIS, Vol. I at 627. The Plan observed, in connection with these lands, that “[u]nder FLPMA, wilderness preservation is part of BLM’s multiple-use mandate, and wilderness is recognized as part of the spectrum of resource values considered in the land use planning process.” BUREAU OF LAND MGMT., U. S. DEP’T OF THE INTERIOR, SOUTHEASTERN OREGON RESOURCE MANAGE-MENT PLAN AND RECORD OF DECISION (“Plan ROD”) 104 (2003).

The BLM considered two possibilities for these lands — adding the land to the WSAs, or not adding the land. *See* FEIS, Vol. I at 373-75. In discussing the first possibility, the BLM proposed to manage such additions as WSAs, under the non-impairment standard of 43 U.S.C. § 1782(c). *Id.* at 374. Yet, the BLM did not intend to recommend such lands for congressional preservation, which would implicate § 1782; instead, it intended to use its normal management authority, derived from its broad land use planning authority, to repli-cate the non-impairment standard. *See id.*; *see also* 43 U.S.C. §§ 1712, 1732.

Aside from these few thousand acres of land, however, other areas with wilderness values not already identified in the 1991 review were not singled out for analysis and plan-

ning purposes. Therefore, for the remainder of this opinion, except as otherwise noted, when we refer to "wilderness characteristics," "wilderness values," or land with those values, we refer to areas outside both the WSAs in the 1991 report and the adjacent lands that the BLM proposed adding to them.

The BLM did consider granting some degree of additional protection from development and other disruptive uses to several hundred thousand acres of land in "areas of critical environmental concern."[8] FEIS, Vol. I at 276-368; *see also* 43 U.S.C. § 1712(c)(3) (requiring the BLM to give priority to area of critical environmental concern in land use planning). These critical areas are broadly defined as "areas within the public lands where special management attention is required . . . to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources, or other natural systems or processes, or to protect life and safety from natural hazards." 43 C.F.R. § 1601.0-5(a). Designation as a critical area does not, of itself, "change or prevent change of the management or use of public lands." *Id.* The Plan, however, contemplated various limitations on ORV use, mineral leasing, and plant collection, among other protections, for such areas.

The critical areas protected by the Southeast Oregon Plan are limited, however. Also, the overlap between the critical area criteria and the statutory definition of wilderness values is only partial. *Compare* 43 C.F.R. § 1601.0-5(a) (defining areas of critical environmental concern) *with* 16 U.S.C. § 1131(c)(1)-(4) (describing wilderness characteristics). As a consequence, the BLM does not structure its critical area decisions to protect wilderness characteristics, nor does designation as a critical area necessarily imply the presence of wilderness characteristics. In fact, several of the areas of critical environmental concern contain roads or other signs of human use that would be incompatible with wilderness val-

---

[8]We will sometimes refer to these areas as "critical areas" for brevity.

ues. *See, e.g.*, FEIS, Vol. I at 293, 299, 303. Some other critical areas, however, do not contain such features and lie, in whole or in part, in existing WSAs. *See, e.g.*, *id.* at 286, 291, 304, 307, 309, 331, 347.

In sum, although the BLM considered incorporating a small amount of land into the WSAs, and protecting some other regions as critical areas, it explicitly disclaimed any general obligation to analyze the impacts of its Plan on wilderness values, or to consider management options for areas with those values, and took no action contrary to that statement.

## 2.   Alternatives Analyses

In considering alternatives for resources for which it did acknowledge its authority to plan, the BLM studied several courses of action. It put forth seven alternatives — A, B, C, D, D2, E, and a single alternative describing the proposed resource management plan, designated as "Proposed RMP" or "PRMP" — which it used to analyze various constellations of management options. *See* FEIS, Vol. I at 152-85. Of note, alternative B would continue present management as a "no action" alternative; alternative D2, added after comments were received on the draft EIS, generally favors more conservation; and alternative E was included to analyze the possibility of ending all uses other than conservation, even though the BLM believed that alternative was not valid because it conflicted with the Bureau's multiple use mandate. *See id.* at xiii, 137-38, 152. The Proposed RMP alternative was ultimately selected for use in the final Plan. Plan ROD at v. We describe the alternatives in detail as they relate to grazing and ORV use.

### a.   Grazing Issues

The BLM sets basic grazing practices and goals in its land use plans. *See* 43 C.F.R. § 4100.0-8 (mandating consideration of grazing management in land use plans). Grazing occupies

large swathes of the public lands in southeastern Oregon and has considerable economic and environmental impacts. The BLM therefore analyzed grazing options for its proposed Plan in the EIS. *See* FEIS, Vol I. at 246-55.

In doing so, the BLM considered alternatives that would adjust both the extent of land open to grazing and the intensity of grazing allowed on public land. The BLM predicted that the general management priorities specified by some of the alternatives analyzed in the EIS would cause grazing intensity to increase over time, while others would result in a decrease in grazing intensity.

Most of the alternatives considered would initially maintain grazing near current levels and would not change the amount of land allocated to grazing. *See* FEIS, Vol. I at xxii, 246-55. Only one alternative deemed valid by the Bureau, Alternative D2, contemplated substantial grazing restrictions, with regard to both area and intensity. (The BLM also considered barring all grazing on public lands in Alternative E but, as noted, it explained that such an alternative could not validly be selected.) The areas closed to grazing in Alternative D2, which considered by far the largest closure, cover portions of the shores of wild and scenic rivers in the planning area, along with some critical areas and several other protected land types. *See id.* at 250-53. Because the BLM did not consider management choices for lands with wilderness characteristics, it did not consider limiting grazing in those areas in particular.

We summarize the alternatives in the following table. As mentioned above, the PRMP alternative was selected for use in the Plan. It is worth noting that, of the alternatives deemed viable by the BLM, only Alternative D2 would close more than about 1% of the land in the planning area to grazing:

|  | Alt. A | Alt. B | Alt. C | Alt. D | Alt. D2 | Alt. E | Alt. PRMP |
|---|---|---|---|---|---|---|---|
| **Total AUMs[9] allocated** | 420,584 | 420,584 | 420,584 | 420,584 | 288,084 | 0 | 420,584 |
| **Projected change in AUMs over time (%)** | + 0 to 10 | + 0 to 5 | +/- 0 to 10 | - 0 to 20 | - 0 to 10 | 0 | +/- 0 to 10 |
| **Est. acres not allocated to grazing** | 50,600 | 41,900 | 50,600 | 50,600 | 1.45 million | 4.6 million | 58,900 |
| **Percent of area not allocated to grazing** | 1.1% | 0.91% | 1.1% | 1.1% | 31.5% | 100% | 1.3% |

---

[9]Grazing intensity is, generally speaking, measured in "animal unit months" ("AUMs"). One AUM is "the amount of forage necessary for the sustenance of one cow or its equivalent for a period of 1 month." 43 C.F.R. § 4100.0-5.

### b.   ORV Issues

"The approval of a resource management plan . . . constitutes formal designation of off-road vehicle use areas." 43 C.F.R. § 8342.2(b). The EIS for the Southeast Oregon Plan therefore considers options for ORV management.

The BLM uses a three-tier system to manage ORVs, designating areas as open, closed, or limited. *See id.* § 8340.0-5(f)-(h), 8342.1. In areas designated as open, "all types of vehicle use is permitted at all times." *Id.* § 8340.0-5(f). Areas designated as limited are "restricted at certain times, in certain areas, and/or to certain vehicular use." *Id.* § 8340.0-5(g). Although these limits "may be of any type," they generally take the form of limits on the number or kind of vehicle allowed, seasons of use, or available routes. *Id.* Finally, unless specially authorized, ORV use is "prohibited" in areas designated as closed. *Id.* § 8340.0-5(h). The BLM may also implement closures in any area, regardless of its ORV designation, if ORVs turn out to cause "considerable adverse effects" to an area's resources. *Id.* § 8341.2. Such a closure would remain in force until "the adverse effects are eliminated and measures implemented to prevent recurrence." *Id.*

The seven alternatives that the BLM considered in the EIS vary almost entirely by the amount of land they allocate between the open and limited use categories. *See* FEIS, Vol. I at xxii, 269-73. The BLM never considered closing a significant amount of land to ORVs. Nor did it consider any management option explicitly geared towards protecting wilderness values from ORV use.

In the EIS, the most protective designation considered — limited — meant restricting ORVs to existing routes in WSAs and other sensitive areas and imposing some seasonal area closures to protect wildlife. *See id.* at 269-73. Despite the nomenclature, the existing routes limitation allows for some ORV travel off existing routes, as most "limited" area desig-

nations in the Plan allow "motorized vehicle-supported camping, unless otherwise posted to meet other resource management objectives, . . . up to 150 traveled feet off an existing road." *Id.* at 273; *see also id.* at 136, 269-73.

None of the considered alternatives would have closed more acreage to ORV use than was closed before the Plan went into effect. Instead, every alternative opened more land to some kind of ORV use than was permitted before. *See id.* at xxii, 269-73. The "PRMP" alternative, which was selected, opens roughly 20,000 acres of previously closed land to some ORV use.

The alternatives considered are as follows:

|  | Alt. A | Alt. B | Alt. C | Alt. D | Alt. D2 | Alt. E | Alt. PRMP |
|---|---|---|---|---|---|---|---|
| **Open (approx. acres)** | 3.27 million | 2.66 million | 3.04 million | 1.34 million | 1.24 million | 0 | 2.62 million |
| **Limited (acres)** | 1.34 million | 1.94 million | 1.58 million | 3.23 million | 3.38 million | 4.63 million | 2.00 million |
| **Closed (acres)** | 30,583 | 35,193 | 17,233 | 18,439 | 18,439 | 278 | 15,826 |
| **Percent of area closed** | 0.66% | 0.77% | 0.37% | 0.40% | 0.40% | 0.006% | 0.34% |

## C.   The Protests and ONDA's Survey

## 1.   ONDA Protests the Proposed Southeast Oregon Plan and EIS

In December 2001, ONDA filed a protest with the BLM of the Plan and final EIS. *See* 43 C.F.R. § 1610.5-2 (describing

protest procedures). The protest sounded the same themes ONDA had raised in its comments on the draft EIS:

First, ONDA again charged that the BLM had failed to analyze wilderness values in the EIS and Plan. It cited several instances in which BLM employees had informed ONDA, when pressed, of changed circumstances in areas outside of WSAs such as planned construction and development projects that never occurred, and pointed out that "ONDA and the general public have no idea how many additional instances of new information and changed circumstances exist with respect to non-recommended wilderness areas," because the EIS does not address the matter. This failure to provide information on wilderness values, ONDA argued, violated NEPA's requirement that the Bureau engage in fully-informed decisionmaking. ONDA further argued that the BLM's response to ONDA's comments on the draft EIS, in which the Bureau had maintained that its wilderness obligations were at an end with the completion of the 1991 wilderness report, was mistaken. It contended that the BLM had a continuing duty to inventory wilderness values on its lands under 43 U.S.C. § 1711 and that it could protect lands with such values using the broad multiple use authority provided by 43 U.S.C. § 1712.

Second, ONDA raised concerns over the limited alternatives considered in the EIS for grazing management, as well as the EIS's alleged failure to consider the cumulative impacts of grazing.

Third, ONDA contended that, as the BLM had "consider-[ed] no alternative that closes more than 0.8% of the public lands within the planning area" to ORV use, the Bureau had committed a "clear violation" of NEPA's alternatives requirement.

The BLM denied the protest in September 2002. It considered ONDA's comments in some detail:

First, as it had done in response to ONDA's comments on the draft EIS, the BLM construed ONDA's concerns as requesting that it reassess the recommendations it made in its 1991 wilderness report, conducted under 43 U.S.C. § 1782. It again explained that the § 1782 wilderness review was a "one-time" responsibility. It dismissed ONDA's NEPA concerns regarding wilderness issues summarily as "not . . . clear."

The BLM answered ONDA's concerns over the grazing alternatives analysis by stating that the alternatives it had considered would have different "effects [from each other] in both the short and long term." And it responded to ONDA's concerns over ORVs by stating that the limited designation would "provid[e] a comparable degree of protection" as the closed designation, and that the alternative analysis was therefore sufficient.

The BLM then adopted the Plan and EIS in a record of decision ("ROD"), *see* 40 C.F.R. § 1505.2, and announced its availability in April 2003. *See* Notice of Availability of the Record of Decision for the Southeastern Oregon Resource Management Plan and Final Environmental Impact Statement, 68 Fed. Reg. 16,307 (Apr. 3, 2003).

## 2. ONDA's Survey

Because the BLM had not responded to its wilderness concerns, ONDA decided to undertake a survey of land with wilderness characteristics outside of the WSAs, documenting changes that had occurred since November 1980, when the BLM completed the inventory supporting its 1991 preservation recommendations. *See* Or. Natural Desert Ass'n, Wilderness Inventory Recommendations: Vale District ("ONDA Survey") (2004). In doing so, ONDA relied upon wilderness inventory procedures described in the BLM's guidance documents. ONDA Survey at i-ii; *see also* Bureau of Land Mgmt., U. S. Dep't of the Interior, BLM Wilderness Inventory and Study Procedures, H-6310-1 ("2001

Handbook") 5-16 (2001) (rescinded 2003) (providing the procedures used by ONDA). The wilderness characteristics ONDA reviewed were those described in the Wilderness Act and incorporated into the FLPMA. In February 2004, ONDA submitted the results of its survey to the BLM.

Because the survey was submitted well after the ROD was issued, it is not part of the administrative record. "However, in NEPA cases, the court may extend its review beyond the administrative record and permit the introduction of new evidence where the plaintiff alleges that an EIS has . . . swept stubborn problems or serious criticism under the rug." *Or. Natural Res. Council v. Lowe*, 109 F.3d 521, 526-27 (9th Cir. 1997) (internal quotation marks and alteration omitted). The survey was admitted in the district court on that ground, and the BLM does not appeal that ruling. We describe the survey here without expressly approving or disapproving its particular empirical findings. Instead, we discuss it to demonstrate how the presence of wilderness values may change over time, and how wilderness characteristics may have been reestablished in parts of the area covered by the Southeast Oregon Plan.

ONDA explained that there had been significant changes since the BLM's last inventory. Lands the BLM had previously determined lacked wilderness characteristics had reverted to a more natural state and, ONDA maintained, now did have such characteristics. Many of these changes occurred, ONDA reported, because little-used roads had deteriorated since November 1980. Because 16 U.S.C. § 1131(c)(1) defines wilderness as an area which "generally appears to have been affected primarily by the forces of nature," the BLM has long treated the presence of roads as cancelling out any other wilderness characteristics an area might otherwise have, as they defeat the "natural conditions" wilderness characteristic. *See* 43 U.S.C. § 1782(a) (providing that the § 1782 review should focus on roadless areas); Bureau of Land Mgmt., U. S. Dep't of the Interior, Wilderness

INVENTORY HANDBOOK ("1978 Handbook") 6 (1978) (discussing roadlessness); *see also* 16 U.S.C. § 1131(c) (defining wilderness characteristics). "In determining whether an area may be subject to further consideration of wilderness characteristics, BLM has distinguished roads that had been actively maintained from ways that were maintained solely by the passage of vehicles. The presence of ways did not render an area 'roaded' so as to eliminate that area from further evaluation as wilderness." *Colo. Envtl. Coalition*, 161 I.B.L.A. 386, 391 (2004) (citation and footnote omitted). *See also* 2001 Handbook at 10; 1978 Handbook at 5. ONDA concluded that many roads had become "ways" over the years, and that other human impacts had also been reduced.

For instance, ONDA represented that in the 62,479 acre Battle Mountain area, roads had decayed to become "nearly invisible overgrown way[s]." ONDA Survey at 1-3. In the 11,433 acre Beaver Dam Creek area, in ONDA's view, a former road was "rutted and washed out in places." *Id.* at 13. Roads that had precluded consideration of the 45,760 acre Black Canyon area had, according to ONDA, deteriorated so much that they were almost nonexistent. *Id.* at 29. In the 32,148 acre Clark's Butte area, ONDA reported that a road was now an "overgrown, washed-out way with little sign of use," *id.* at 65, and what had once been small reservoirs had dried up and vanished, *id.* at 66. And the Lower Owyhee Canyon, an 11,578 acre area that the BLM had deemed to be without wilderness characteristics in 1980 because of nonnative grass seeding, had, as described in the survey, returned to largely native vegetation. *Id.* at 180. In short, ONDA presented the landscape as having changed significantly.

In all, the ONDA study concluded that there are now more than 1.3 million acres of land in the planning area outside the WSAs that display wilderness characteristics. *Id.* at i. The BLM did not, however, alter the Plan or otherwise take action on ONDA's new information.

### D.   The Litigation

Meanwhile, in July 2003, ONDA filed suit against the BLM. In its first amended complaint, ONDA alleged that the Plan and EIS violated NEPA, the FLPMA, and the Taylor Grazing Act of 1934, 43 U.S.C. §§ 315 *et seq.* Because we ultimately remand on NEPA grounds, we do not address the causes of action under the FLPMA and the Taylor Grazing Act, which may no longer pertain after remand, but focus instead on the NEPA issues.

Continuing to pursue the issues raised in its comments and protest, ONDA contended in its complaint that the BLM had violated NEPA by (1) "fail[ing] to take a 'hard look' at the environmental consequences of the proposed action, because the Plan and FEIS do not present adequate baseline information and discussion on critical environmental resources and/or resource issues, including . . . current conditions of . . . non-WSA roadless areas;" (2) failing adequately to analyze the cumulative impacts of the Plan; and (3) "fail[ing] to analyze and discuss a reasonable range of alternatives . . . with respect to areas allocated to livestock grazing and to off-highway vehicle restrictions."[10]

Both ONDA and the BLM moved for judgment on the administrative record. *Cf. Pit River Tribe*, 469 F.3d at 778 (stating that "[b]ecause this is a record review case, we may direct that summary judgment be granted to either party based upon our de novo review of the administrative record") (internal quotation marks omitted); *Riddell v. Unum Life Ins. Co. of Am.*, 457 F.3d 861, 864 (8th Cir. 2006) (explaining that judgment on the administrative record "is a form of summary judgment"). The district court granted judgment to the BLM, adopting the findings and recommendations of the magistrate judge to whom the case had been assigned.

---

[10]ONDA also raised other NEPA issues. Because it does not pursue them on appeal, we do not discuss them.

Specifically, the district court first held, citing *SUWA*, 542 U.S. 55, that the BLM was not "legally required to perform a wilderness inventory," and so could not be faulted for failing in the EIS to analyze non-WSA land that might now have wilderness characteristics, or to discuss management options for such lands. The court also decided that the BLM had adequately considered cumulative impacts; that the BLM had considered an adequate range of grazing alternatives, in part because all of the alternatives allowed the BLM to adjust grazing AUM allocations over the course of the Plan, and in part because Alternative D2 considered closing a significant area to grazing; and that the BLM had considered a proper range of ORV alternatives, as both the limited and closed designations provided protection from off-road traffic.

ONDA timely appealed.

## II.  Analysis

### A.  Standard of Review

"A 'district court's determination on summary judgment that the BLM complied with NEPA is reviewed *de novo*.'" *Klamath-Siskiyou Wildlands Ctr. v. Bureau of Land Mgmt.*, 387 F.3d 989, 992 (9th Cir. 2004) (quoting *Kern*, 284 F.3d at 1069-70). Judicial review of the BLM's compliance with NEPA is governed by the Administrative Procedure Act of 1946 ("APA"), 5 U.S.C. § 551 *et seq. Pit River Tribe*, 469 F.3d at 778. Under the APA, we must "hold unlawful and set aside agency action, findings, and conclusions" if, among other things, they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also, e.g.*, *Pit River Tribe*, 469 F.3d at 778 (reviewing an EIS under § 706(2)(A)); *Earth Island Inst.*, 442 F.3d at 1156-57 (same); *Lowe*, 109 F.3d at 526 (same).

### B.  Land with Wilderness Characteristics

The BLM did not explicitly consider wilderness values in its EIS, despite ONDA's repeated requests that it discuss and

analyze wilderness characteristics on its lands in southeastern Oregon. To determine whether it violated NEPA by failing to do so, we consider the nature of the BLM's authority and obligations with regard to wilderness characteristics and the BLM's rationale for not considering lands with wilderness values.

"In order to decide what kind of an environmental impact statement need be prepared, it is necessary first to describe accurately the 'federal action' being taken." *Aberdeen & Rockfish R.R. Co. v. Students Challenging Regulatory Agency Proc. (S.C.R.A.P.)*, 422 U.S. 289, 322 (1975). Thus, just as "[w]here an action is taken pursuant to a specific statute, the statutory objectives of the project serve as a guide by which to determine the reasonableness of objectives outlined in an EIS," *Westlands Water*, 376 F.3d at 866, so too do the statutory objectives underlying the agency's action work significantly to define its analytic obligations. Put differently, because "NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action," *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 553 (1978), the considerations made relevant by the substantive statute driving the proposed action must be addressed in NEPA analysis.[11]

---

[11]The BLM misses this point when it argues that it has no NEPA obligation because *that* statute contains no provision that makes explicit mention of "wilderness characteristics."

It is true that NEPA does not mention "wilderness characteristics." It would be surprising if it did so. NEPA is designed to apply broadly, to all sorts of federal activities. It is not a laundry list of factors to be considered and could not be. Instead, the factors to be considered are derived from the statute the major federal action is implementing, as well as from the nature of the action itself. It is, consequently, not at all unusual to review EIS's with regard to consideration of factors not specifically mentioned in NEPA. *See, e.g.*, *Earth Island Inst.*, 442 F.3d at 1160-67 (holding an EIS for a forest project inadequate because it failed properly to consider "tree mortality"); *Hells Canyon Alliance v. U.S. Forest Serv.*, 227 F.3d 1170, 1180-81 (9th Cir. 2000) (considering whether an EIS for a recreation man-

Here, the BLM is charged with "manag[ing] the public lands under principles of multiple use and sustained yield," 43 U.S.C. § 1732(a), and with developing a resource management plan which would allow it do so, *id.* § 1712(c). The EIS and Plan, specifically, were "prepared to provide the BLM . . . with a comprehensive framework for managing public land" in southeastern Oregon. FEIS, Vol. I at 3. Among the BLM's "primary goal[s]" was to "develop management practices that ensure the long-term sustainability of healthy and productive land, consistent with principles of ecosystem management." *Id.* To fulfill this purpose, then, the EIS supporting the Plan had to consider the land resources and values, *see* 43 U.S.C. §§ 1702(c), 1711(a), 1712(c)(4), 1732(a), relevant to its long-term management strategy.

In ONDA's view, the remaining analysis is straightforward: The BLM did not consider wilderness values, despite comments urging it do so. ONDA observes that the Plan itself identifies wilderness as "part of the spectrum of resource values considered in the land use planning process," Plan ROD at 104, and argues that the FLPMA places management of wilderness values squarely within the BLM's land use planning authority. ONDA also observes that the Plan could affect such values on lands outside of the WSAs. So, in light of the Plan's purpose of providing a "comprehensive framework for managing public land," NEPA requires analysis of these issues in the EIS. Because the EIS offers no discussion of non-WSA lands with wilderness values other than a disclaimer of any obligation to consider them, it did not provide a "full and fair discussion" of the impacts of the Plan and the alternatives before the BLM, and so violated NEPA. *See* 40 C.F.R. § 1502.1.

agement plan in Hells Canyon adequately considered jetboating alternatives); *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213-14 (9th Cir. 1998) (considering whether NEPA mandated further consideration of "sedimentation issues" and "risks to the area's renowned fish population" for a logging project near salmon streams).

The BLM sees the question very differently. In its view, "wilderness characteristics" matter for one, and only one, purpose: They provide criteria to be used in the 43 U.S.C. § 1782 survey of lands to recommend for permanent preservation, which, the Bureau argues, was a "one-time" duty. No other provision of the FLPMA, the Bureau maintains, "requires BLM to conduct inventories of, or otherwise specially consider, 'wilderness characteristics' in land use planning, and BLM completed the [§ 1782] wilderness review in 1991." Indeed, the BLM goes so far as to suggest that ONDA came up with the very *idea* of wilderness characteristics:

> [I]n arguing that BLM has not satisfied NEPA, ONDA seeks to impose upon BLM its own framework for managing public lands. This framework is centered around ONDA's notion of "the wilderness resource," a management category that is found nowhere in any governing law and consists only of vaguely-described "characteristics" that ONDA believes should drive BLM's planning and evaluation processes. If the Court were to accept ONDA's argument, any group could assign a label to a set of "characteristics" and then argue that BLM must inventory for and analyze those values in order to satisfy the FLPMA and NEPA. This is not, and cannot be, the law.

The BLM, in other words, essentially dismisses ONDA's argument that wilderness characteristics constitute one of the values of the public lands, which it may manage under the multiple-use mandate in its land use plans. Instead, it sees wilderness characteristics of importance only for a purpose already past. So, while the Bureau acknowledges that it *could* manage its lands to promote such characteristics, just as it could manage its land to promote many other goals, it does not acknowledge wilderness characteristics as a value of the public lands specifically identified by the FLPMA, and so sees no reason to address "wilderness characteristics" as a dis-

crete resource category in its EIS. Following this line of argument, the BLM points out that it has considerable methodological discretion as to how it complies with NEPA and argues that its consideration of the Plan's effects need not embrace "ONDA's notion of the 'wilderness resource,' " as long as it otherwise provides a full and fair discussion of the Plan. This argument comports with the BLM's responses to ONDA's comments, which rely solely on the fact that the BLM completed a 43 U.S.C. § 1782 review years ago to justify excluding *any* consideration of wilderness values in the EIS now.

Our question, then, is whether ONDA is right, and wilderness characteristics are among the values the FLPMA specifically assigns to the BLM to manage in land use plans, or whether the BLM is right, and wilderness characteristics have no independent vitality apart from their use in the § 1782 process. If ONDA is correct, then the BLM's reliance on its completion of the 1991 wilderness report cannot, of itself, justify excluding a wilderness values analysis entirely from the EIS.

This question is placed in sharper focus because, after the EIS was completed, the BLM entered into a settlement regarding the reach of the BLM's management authority concerning wilderness. In an April 2003 settlement with the state of Utah, the BLM agreed to an interpretation of 43 U.S.C. § 1782 limiting the BLM to a one-time review of areas with wilderness characteristics, for the purpose of recommending such areas for permanent congressional preservation, with the review power expiring "fifteen years after October 21, 1976," *see* 43 U.S.C. § 1782(a). The BLM therefore agreed (1) that it would cease recommending lands for permanent preservation as wilderness; (2) that it would not, going forward, "establish, manage or otherwise treat public lands . . . as WSAs or as wilderness . . . absent congressional authorization"; and (3) that it would withdraw the 2001 Handbook, which contained guidelines for further wilderness recommendations. *See Utah v. Norton*, 396 F.3d 1281, 1284-85 (10th Cir. 2005)

(describing the history of the litigation leading to the settlement); *see generally Utah v. Norton*, No. 2:96-CV-0870, 2006 WL 2711798 (D. Utah Sept. 20, 2006) (describing the settlement). The settlement, then, tracks — but, as we shall see, only in part — the BLM's position in this case regarding its one-time obligation to consider wilderness characteristics on BLM land.

The Attorney General lacks the power "to agree to settlement terms that would violate the civil laws governing the agency," *United States v. Carpenter*, ___ F.3d. ___, 2008 WL 2096927, at *5 (9th Cir. May 20, 2008) (quoting *Executive Bus. Media, Inc. v. U.S. Dep't of Def.*, 3 F.3d 759, 761 (4th Cir. 1993)), so the Utah settlement is only valid if it comports with the FLPMA, NEPA, and other relevant law. The parties maintain, nonetheless, that we need not directly consider the legality of the 2003 Utah settlement agreement in this case.[12]

We agree. Wilderness values are among the resources which the BLM can manage under 43 U.S.C. §§ 1712 and 1732. Wilderness characteristics are not simply a checklist to be used in completing the § 1782 survey, and they are certainly not just one of ONDA's "notions," as the BLM would have it. As a result, the BLM's response to ONDA's concerns in the EIS — that, because it had completed the § 1782 survey wilderness characteristics were "outside the scope" of the EIS for the land use plan — was incorrect and, standing alone, does not satisfy NEPA's requirements.

To explain this conclusion, we consider the statutory and regulatory structure binding the BLM. We then turn to the Bureau's own guidance documents and other public statements, which are consistent with our understanding, and then address relevant case law. We next consider the BLM's

---

[12]The matter is presently before the Tenth Circuit, *see Utah v. Kempthorne*, No. 06-4240 (10th Cir.).

salient counter-arguments. Finally, we explain how the BLM may address its error on remand.

## 1.  Statutory and Regulatory Authority

[1] Read carefully and in context, the FLPMA makes clear that wilderness characteristics are among the values which the BLM can address in its land use plans, and hence, needs to address in the NEPA analysis for a land use plan governing areas which may have wilderness values.

[2] As we have explained, wilderness characteristics are enumerated by the Wilderness Act, in 16 U.S.C. § 1131(c)(1)-(4). They are incorporated into the FLPMA in several ways. In addition to the language of 43 U.S.C. § 1782, discussed above,[13] 43 U.S.C. § 1702(i) provides that "[t]he term 'wilderness' as used in section 1782 of this title shall have the same meaning as it does in section 1131(c) of Title 16" — which is the Wilderness Act definition. *See also California v. Block*, 690 F.2d 753, 762 (9th Cir. 1982) (referring to "wilderness features" to be used in federal land management); *Watt*, 608 F. Supp. at 309 ("[W]ilderness characteristics [are those] as described in the Wilderness Act."). The BLM similarly records in its current land use planning handbook that wilderness characteristics are "naturalness, outstanding opportunities for solitude, and outstanding opportunities for primitive and unconfined recreation," a paraphrase which closely tracks 16 U.S.C. § 1131(1)-(3). BUREAU OF LAND MGMT., U. S. DEP'T OF THE INTERIOR, LAND USE PLANNING HANDBOOK, H-1601-1

---

[13]Again, § 1782(a) provides, in pertinent part (emphasis added):

Within fifteen years after October 21, 1976, the Secretary shall review those roadless areas of five thousand acres or more and roadless islands of the public lands, *identified during the inventory required by section 1711(a) of this title as having wilderness characteristics described in the Wilderness Act of September 3, 1964* . . . and shall from time to time report to the President his recommendation as to the suitability or nonsuitability of each such area or island for preservation as wilderness . . . .

("2005 Handbook") Appx. C 12 (2005);**¹⁴** *see also* 2001 Handbook 10-16 (describing wilderness characteristics); 1978 Handbook 6 (same). The Interior Board of Land Appeals ("IBLA"), an administrative adjudicative body of the Department of the Interior which has jurisdiction over the BLM, *see generally* 43 C.F.R. §§ 4.400 *et seq.*, has also long held as much. *See, e.g.*, *Colo. Envtl. Coalition*, 165 I.B.L.A. 221, 223 n.3 (2005) (explaining that the 43 U.S.C. § 1782 review concerns "wilderness characteristics as described in the Wilderness Act"); *Michael Huddleston*, 76 I.B.L.A. 116, 118 (1983) (explaining that wilderness characteristics are defined by the "statutory criteria" of the Wilderness Act); *Tri-County Cattleman's Ass'n, Idaho Cattleman's Ass'n*, 60 I.B.L.A. 305 (1981) (stating that "[t]he wilderness characteristics alluded to in [§ 1782] are set forth in . . . 16 U.S.C. 1131(c)"); *Save the Glades Comm.*, 54 I.B.L.A. 215, 217 (1981) (same). The BLM's present suggestion that ONDA came up with the idea of wilderness characteristics is then both wrong and inexplicable, in light of the long history of the statutory "wilderness characteristics" concept.

**[3]** As noted earlier, the FLPMA's provision directing the BLM to conduct an initial wilderness review provides that "those roadless areas of five thousand acres or more and roadless islands of the public lands . . . having wilderness characteristics described in the Wilderness Act" are to be "identified during the inventory required by section 1711(a)." 43 U.S.C. § 1782(a). Notably, the statute does not direct that areas with wilderness characteristics be identified only as part of recommending such areas for "preservation as wilderness." *Id.* Instead, it contemplates a "*review*" of areas *already* so "iden-

---

**¹⁴**The 2005 Handbook, along with the BLM briefs in other courts that we cite later in this opinion are not in the record. We take judicial notice of these public documents. *See* Fed. R. Evid. 201(b)(2). We note that the BLM guidance documents we cite were issued after the 2003 Utah settlement, and so demonstrate that the settlement did not change the Bureau's recognition of the basic connection between the FLPMA and the Wilderness Act.

tified," *id.* (emphasis added), in the course of the general BLM "inventory of all public lands and their resource and other values," an inventory process which is to be "kept current so as to reflect changes in conditions and to identify new and emerging resource and other values." *Id.* § 1711(a). In other words, reading §§ 1711(a) and 1782(a) together, the statute specifically contemplates that the § 1711(a) inventory process includes identification of wilderness characteristics — including those that are "new and emerging" or which arise from "changes in conditions" — and that it will do so continuously, with no time limit.[15]

As to the BLM's authority to include such identified lands in its management planning, the multiple use management and planning mandates of 43 U.S.C. §§ 1712 and 1732 pertain to the "management of the public lands and their various resource values." *Id.* § 1702(c). Section 1711(a), again, provides for "an inventory of all public lands and their resource and other values." Because wilderness characteristics are to be identified by that inventory, they are, as we earlier explained, necessarily among those "resource and other values."[16] And, as wilderness characteristics are among the "resource and other values" recognized under the FLPMA, they are to be managed as part of the complex task of managing "the various resources without permanent impairment of the productivity of the land and the quality of the environment." *Id.* § 1702(c); *see also id.* § 1732(a) ("The Secretary shall manage the public lands under principles of multiple use. . . ."). This management is to be done "in accordance with

---

[15]In its briefs before the District Court for the District of Utah in the settlement litigation, Response Brief of the Federal Defendants to Intervenors' Opening Brief at 32-33, *Utah v. Norton*, No. 2:96-CV-0870 (filed Apr. 7, 2006), the BLM affirmed that it "will still inventory public lands for their resource and other values," *id.* at 33, and that this inventory could include "characteristics that are associated with the concept of wilderness," *id.* at 37 (internal quotation marks omitted).

[16]*See supra* note 4 for a discussion of the terms "resource and other values," "resource values," and "resources," in §§ 1702(c) and 1711(a).

land use plans developed . . . under section 1712 . . . when they are available." *Id.* § 1732(a). Land use plans, in turn, must "use and observe the principles of multiple use." *Id.* § 1712(c)(1), whether or not the § 1711 inventory "is available," *id.* § 1712(c)(4).

**[4]** Once the statute is so understood, it becomes evident that permanent preservation of wilderness using the 43 U.S.C. § 1782 process is just one aspect of the BLM's broader management authority for lands with wilderness characteristics. In *SUWA*, the Supreme Court confirmed as much. *See* 542 U.S. at 58-59 (describing setting aside some lands "as wilderness at the expense of commercial and recreational uses" as one of the choices before the BLM); *see also id.* at 59 ("Aside from the identification of WSAs, the main tool that BLM employs to balance wilderness protection against other uses is a land use plan . . . ."); *id.* at 60 ("Protection of wilderness has come into increasing conflict with *another* element of multiple use . . . .") (emphasis added). At the same time, the BLM's wide authority to "manage the public lands under principles of multiple use and sustained yield," 43 U.S.C. § 1732(a), allows it ample discretion for management of lands with wilderness values.

For instance, the BLM could manage such lands to afford them protection from extractive uses, or from potentially destructive uses like grazing or ORVs, without requiring complete, permanent non-impairment of wilderness values. It could, for example, place limitations on grazing leases on lands with wilderness characteristics "to achieve management and resource condition objectives for the public lands," 43 C.F.R. § 4130.3(a), or reduce the "levels of production or use" on such lands through a resource management plan, *id.* § 4100.0-8. Similarly, the BLM can restrict ORV use to "minimize damage to soil, watershed, vegetation, air, or other resources of the public lands." *Id.* § 8342.1(a). ORV use may also be restricted to "prevent impairment of wilderness suitability," *id.,* a restriction which uses the language of the non-

impairment standard that the statute applies to WSAs, but does so with regard to only one kind of impairment, thereby not mandating complete non-impairment.[17]

Going further, the BLM could place many lands with wilderness characteristics in special management categories that, while not as protective as the non-impairment standard, still afford considerable protection. Designating some such regions as areas of critical environmental concern is one obvious option. *See id.* § 1610.7-2. The BLM might also designate such lands "that have ecological or other natural history values of scientific interest" as research natural areas to protect them for research and education. *See id.* §§ 8200.0-1 to 8223.1.[18]

The BLM could also — according to its own representations to the Tenth Circuit in the Utah settlement litigation — adopt for some non-WSA lands with wilderness characteristics a temporary "modified non-impairment" policy, quite different from the permanent non-impairment policy imposed on WSAs by § 1782(c). As the BLM put it in its brief to the Tenth Circuit:

> [The BLM] has the authority under [43 U.S.C.

---

[17]Notably the ORV "wilderness suitability" regulation is not limited in its application to WSAs.

[18]A "research natural area" is:

[A]n area that is established and maintained for the primary purpose of research and education because the land has one or more of the following characteristics:

(1) A typical representation of a common plant or animal association;
(2) An unusual plant or animal association;
(3) A threatened or endangered plant or animal species;
(4) A typical representation of common geologic, soil, or water features; or
(5) Outstanding or unusual geologic, soil, or water features.

43 C.F.R. § 8223.0-5(a).

§ 1712] to manage lands in a manner that is similar
to the non-impairment standard that applies to wil-
derness study areas under [§ 1782], by emphasizing
the protection of wilderness-associated characteris-
tics as a priority over other potential uses. . . .
[U]nder [§ 1712] the agency retains the discretion to
change its designation and management of public
lands through the land use planning process, whereas
[§ 1782(c)] requires BLM to manage lands pursuant
to the non-impairment standard 'until Congress has
determined otherwise.'

Brief of the Federal Appellees at 41, *Utah v. Kempthorne*, No.
06-4240 (filed Feb. 2007) (footnote omitted, quoting 43
U.S.C. § 1782(c)); *see also Utah v. Norton*, 2006 WL
2711798, at *23 ("Both Utah and the BLM acknowledge that
the BLM has discretion to manage lands in a manner that is
similar to the non-impairment standard by emphasizing the
protection of wilderness characteristics."). Under this stan-
dard, the BLM could later — within the time period covered
by a particular land use plan, if the plan so provides, or after-
wards — reconsider the restrictions on use of the area under
the Bureau's multiple use mandate and, perhaps, determine
that the non-impairment standard for that particular land with
wilderness characteristics should be abandoned. Because such
an approach entails alterable rather than permanent protection
of land as wilderness, it is not at all equivalent to § 1782(c)
protection.

Finally, the BLM could, with adequate consideration dur-
ing the planning process, decide not to manage some lands
with wilderness characteristics so as to preserve those charac-
teristics, but instead manage them for uses which would be
inconsistent with long-term wilderness preservation.

[5] Our point, simply put, is that various options for the
management of lands with wilderness characteristics remain
even if permanent congressional preservation of non-WSA

land is no longer an option.[19] As a result, wilderness characteristics retain vitality as a resource category covered by the BLM's multiple-use land use planning mandate. The BLM was therefore incorrect when it asserted, in its responses to ONDA and this court, that it had no duty to inventory or analyze wilderness characteristics because it had years ago completed a § 1782 review. Even assuming its § 1782 obligation was a "one-time" duty, the BLM's authority to manage this statutorily-defined resource nevertheless continues in other ways.

[6] As a result, the BLM's response to ONDA's wilderness concerns in the EIS was simply not responsive. Although the BLM asserts that it has "completed its required evaluation and assessment of wilderness values on public land" under § 1782, *see* FEIS, Vol. III at 105, completion of that process does not alone provide a justification to eliminate wilderness issues from "[d]etailed [s]tudy" in the EIS, *see id.* at 12.

## 2.   BLM Guidance Documents

The BLM's public guidance documents are consistent with our understanding of its authority, and of its error in devising the EIS for the planning area. "The well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001) (internal quotation marks and alteration omitted). We defer to the BLM's guidance doc-

---

[19]The IBLA also understands that, even after the 2003 Utah settlement, the BLM retains authority to consider wilderness characteristics when amending its [land use plans]," and, hence, when writing new land use plans. *See, e.g.*, *Colo. Envtl. Coalition*, 161 I.B.L.A. at 396. However, "[r]eview of land use plans is outside the scope of [the IBLA]'s jurisdiction, although the [IBLA] has jurisdiction to adjudicate an appeal of a BLM decision implementing a resource management plan," *Moffat County Rd. Dep't*, 158 I.B.L.A. 221, 231 (2003), so its views on this point have, at most, limited persuasive authority.

uments to the extent that we find them well-reasoned and per-
suasive in light of our understanding of the underlying
statutes, with which they are largely in accord. *See id.* at 227-
28.

**[7]** Specifically, the BLM, in its 2005 land use planning
handbook, recognizes that it has the continuing authority to
manage lands with wilderness values in its land use plans. It
also acknowledges the corresponding responsibility, as appro-
priate in the circumstances of a given plan, to analyze wilder-
ness characteristics in the NEPA documents supporting the
plan, regardless of whether or not it has also forwarded such
lands for permanent congressional preservation.

In the 2005 Handbook, the BLM lists "wilderness charac-
teristics" as among the resources that land use plans manage,
and advises that if wilderness values "exist[ ] in the planning
area," the plan should:

> Identify decisions to protect or preserve wilderness
> characteristics (naturalness, outstanding opportuni-
> ties for solitude, and outstanding opportunities for
> primitive and unconfined recreation). Include goals
> and objectives to protect the resource and manage-
> ment actions necessary to achieve these goals and
> objectives. For authorized activities, include condi-
> tions of use that would avoid or minimize impacts to
> wilderness characteristics.

2005 Handbook, Appx. C. at 1, 12; *see also id.*, Appx. F. at
7 (listing "[w]ilderness characteristics" as distinct resources to
be considered in the "area profile" of a land use plan implicat-
ing those resources, and "[w]ilderness" as a special designa-
tion distinct from "[w]ilderness study areas"). The BLM also
directs its officials to analyze wilderness characteristics in
NEPA documents associated with plans for areas with those
resources. *See id.*, Appx. F at 16 (listing wilderness character-
istics as among the resources to be discussed, as appropriate,

in the "[a]ffected [e]nvironment" section of an EIS); 18 (list-ing wilderness characteristics as among the resources to be discussed in the "[e]nvironmental [c]onsequences" section of an EIS for a plan affecting lands with wilderness values).

The views the BLM expresses in its guidance documents "claim the merit of . . . [a] thoroughness, logic, . . . [and] fit with prior interpretations" of the relevant statutes, *Mead Corp.*, 533 U.S. at 235, as its brief does not. The 2005 Hand-book lends support to our view that wilderness characteristics remain a resource the BLM has authority to manage, and so must address in an EIS concerning areas which may have such characteristics, regardless of whether its 43 U.S.C. § 1782 responsibilities have been satisfied.

### 3.   Case Law

[8] Our view of the BLM's powers and obligations under NEPA and the FLPMA is further supported by our own cases considering the related question of whether agencies need consider in NEPA documents the roadless character of lands under their management. As we have earlier explained, *see supra* Part I(C)(II), roadlessness is critical to fulfilling the "natural conditions" wilderness characteristic, *see* 16 U.S.C. § 1131(c).[20] And, as roadlessness alone may require NEPA

---

[20]We described the environmental importance of roadlessness in *Koote-nai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1121 (9th Cir. 2002) (inter-nal quotation marks omitted):

> [R]oadless areas contribute to the health of the public because they help preserve the forest system's watersheds, the rivers, streams, lakes, and wetlands that are the circulatory system of ecosystems, and water is the vital fluid for inhabitants of these ecosystems, including people. The roadless areas also provide important habitat for a variety of terrestrial and aquatic wildlife and plants, including hundreds of threatened, endangered, and sensitive species. Roadless areas in our national forests also help conserve some of the last unspoiled wilderness in our country. The unspoiled forest provides not only sheltering shade for the visitor and sustenance for its diverse wildlife but also pure water and fresh oxygen for humankind.

consideration in some circumstances, even though it chiefly relates to only one of several wilderness characteristics, wilderness characteristics themselves must also require NEPA consideration when they are implicated by land use planning efforts.

We analyzed roadlessness in the related context of the United States Forest Service's land management and NEPA responsibilities. In *Smith v. United States Forest Service*, we made clear that "an area's roadless character has . . . environmental significance," and required NEPA analysis. 33 F.3d at 1078. The Forest Service, not unlike the BLM in this case, argued that "the sole significance of [roadlessness] is that the [roadless] parcel is potentially eligible for wilderness designation." *Id.* at 1077. Because the Forest Service was not required to consider permanent protection for the areas at issue, *see id.* at 1074 (citing the Washington State Wilderness Act, Pub. L. No. 98-339, 98 Stat. 299 (1984)), the Forest Service maintained that "the fact that a parcel of . . . land is roadless is, in itself, immaterial and need not be addressed in NEPA documents." *Id.* at 1078. We rejected that argument, observing that roadlessness has environmental significance apart from permanent wilderness preservation and, as a result, "[t]hat the land has been released by Congress for nonwilderness use does not excuse the agency from complying with its NEPA obligations when implementing a land-use program." *Id.*

We have recently confirmed that these holdings apply at least to areas of greater than 5,000 acres, even if they have not previously been inventoried for wilderness consideration, and also to inventoried areas of under 5,000 acres. *Lands Council v. Martin*, 479 F.3d 636, 640 (9th Cir. 2007).[21]

---

[21]The opinions do not mention any allegation by the plaintiffs in those cases that wilderness characteristics had to be considered in NEPA documents.

**[9]** Because "[r]oadless areas . . . also help conserve some of the last unspoiled wilderness in our country," *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1121 (9th Cir. 2002), there is no reason to suppose that such characteristics, when they appear on BLM land, rather than on Forest Service land, do not implicate the planning process. They therefore also implicate NEPA. And it would be very strange if roadlessness, a key factor in determining one of the wilderness characteristics, was alone worthy of NEPA consideration, while other statutorily-enumerated wilderness characteristics were not. Our roadlessness cases, then, are consistent with our holding that a landscape's wilderness characteristics generally must be considered in NEPA documents prepared for land use plans concerning that landscape, regardless of whether permanent wilderness preservation is an option.[22]

### 4. The BLM's Response

In addition to insisting, in light of the completion in 1991 of its § 1782 wilderness report, that it had no NEPA duty to address ONDA's wilderness characteristics concerns, BLM advances three counter-arguments to the reasoning we have set out. It maintains first that the Supreme Court's *SUWA* case, 542 U.S. 55, which concerns limitations on APA suits for an agency's failure to act, bars review; second, that the Court's analysis in *Vermont Yankee*, 435 U.S. 519, likewise prevents us from addressing the EIS's failings; and third that

---

[22]Several district courts are in accord with this analysis. *See Or. Natural Desert Ass'n v. Shuford*, No. 06-242-AA, 2007 WL 1695162 (D. Or. June 8, 2007) (upholding the BLM's NEPA wilderness analysis where the "BLM evaluated ONDA's proposed [wilderness areas] and identified one parcel . . . as having wilderness characteristics"); *Chihuahuan Grasslands Alliance v. Norton*, 507 F. Supp. 2d 1216, 1235-38 (D. N.M. 2007) (recognizing the BLM's duty to "address potential wilderness-quality lands through NEPA"); *Or. Natural Desert Ass'n v. Rasmussen*, 451 F. Supp. 2d 1202, 1212-13 (D. Or. 2006) (holding that the BLM has "a responsibility to provide accurate information regarding any changes to the wilderness characteristics" in an area affected by its actions).

the BLM is owed deference as to the methodology it adopts to comply with its NEPA obligations, including the failure to consider wilderness characteristics at all. None of these arguments is persuasive.

### a.  *SUWA*

*SUWA* held, *inter alia*, that an APA suit under 5 U.S.C. § 706(1) to "compel agency action unlawfully withheld or unreasonably delayed" "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*," 542 U.S. at 64 (emphases in original). The BLM maintains that the duty to inventory wilderness values imposed on the BLM by 43 U.S.C. § 1711 is not such a discrete duty.

ONDA challenges the EIS, under 5 U.S.C. § 706(2)(A), as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," not under 5 U.S.C. § 706(1), as "agency action unlawfully withheld or unreasonably delayed." There is no doubt that it may do so. Once an EIS's analysis has been solidified in a ROD, an agency has taken final agency action, reviewable under § 706(2)(A). *See* 40 C.F.R. § 1505.2(a) (the ROD "[s]tate[s] what the decision was"); *see also Laub v. U.S. Dep't of the Interior*, 342 F.3d 1080, 1087-91 (9th Cir. 2003) (holding that the ROD and EIS for a program were final agency action); *Or. Natural Res. Council v. Harrell*, 52 F.3d 1499, 1503 (9th Cir. 1995) (holding a ROD to be final agency action); *see also Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1173 (11th Cir. 2006) (holding it "well settled that 'a final EIS or the record of decision issued thereon constitute[ ] final agency action.' ") (quoting *Sw. Williamson County Cmty. Ass'n v. Slater*, 173 F.3d 1033, 1036 (6th Cir. 1999)); *Sierra Club v. U.S. Army Corps of Engineers*, 446 F.3d 808, 815 (8th Cir. 2006) (noting that "[t]he Supreme Court has strongly signaled that an agency's decision to issue . . . an environmental impact statement is a 'final agency action' permitting immediate judicial review

under NEPA") (citing *Ohio Forestry*, 523 U.S. at 737); *Goodrich v. United States*, 434 F.3d 1329, 1335 (Fed. Cir. 2006) (collecting "case law from our sister circuits holding that, for purposes of the [APA] a ROD is a 'final agency action' "); *Highway J Citizens Group v. Mineta*, 349 F.3d 938, 958 (7th Cir. 2003) (stating that NEPA "documents are intended to be the culmination of an agency's environmental assessment"); *Utah v. U.S. Dep't of the Interior*, 210 F.3d 1193, 1196 (10th Cir. 2000) (holding that "judicial review of final agency action under the Administrative Procedure Act . . . provides the proper procedure to challenge the sufficiency of an EIS"); *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 187 (4th Cir. 1999) (holding that the "designation of the ROD as final agency action under the APA is generally recognized"); *Sierra Club v. Slater*, 120 F.3d 623, 631 (6th Cir. 1997) (holding that "it appears well-established that a final EIS or the ROD issued thereon constitute the 'final agency action' for purposes of the APA" and collecting cases).

We review final agency action under § 706(2)(A) to determine if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." For example, if we hold an EIS inadequate under the § 706(2)(A) standard because it "entirely failed to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and direct the agency to redo it, we are reviewing the validity of the final agency action that *was* taken, not — as in *SUWA* — demanding that the agency take some action that it has *not* taken. That is why "holes" in an EIS which render it invalid under § 706(2)(A) need not, themselves, be "discrete agency action[s]" under *SUWA*, 542 U.S. at 64 (emphasis omitted), as the BLM argues.

Under the BLM's contrary reading of *SUWA*, the only analytic errors that could be corrected under NEPA would be those that could provide independent causes of action under § 706(1). But there are many analytic errors that cause an EIS

to fail under the § 706(2)(A) standard but are not independently violative of § 706(1). Consider, for instance, *Earth Island Institute v. United States Forest Service*, a fairly typical NEPA case, recently decided, in which we held that an EIS for a forestry project was inadequate because it did not accurately describe tree mortality. *See* 442 F.3d at 1160-67. There is, so far as we know, no discrete statutory duty specifically to study tree mortality. Put another way, the plaintiffs probably could not sue to require the Forest Service to conduct such a study simply because it might at some juncture become useful. But once the agency *had* completed a NEPA analysis in an EIS, the plaintiffs could challenge the final action reflected in the EIS and ROD as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," because the agency had unlawfully failed to comply with its NEPA obligations of taking a "hard look" at the tree mortality data before committing itself to a major federal action.

For these reasons, the aspect of *SUWA* upon which the BLM relies is simply not pertinent to this appeal.

### b.   The *Vermont Yankee* Argument

We also hold that *Vermont Yankee* does not defeat ONDA's contentions. *Vermont Yankee* holds, *inter alia*, that "NEPA cannot serve as the basis for a substantial revision of the carefully constructed procedural specifications of the APA" and that we should not, as a result, "impose upon [an] agency [our] own notion of which procedures are 'best.' " 435 U.S. at 548-49. The BLM contends that accepting ONDA's position regarding wilderness characteristics would impose such additional procedures upon it, in violation of the principles articulated by *Vermont Yankee*.

The BLM's *Vermont Yankee* argument is wide of the mark. By holding the BLM to its NEPA obligations with regard to consideration in the EIS of wilderness values, we do not "mandate that a federal agency step through procedural

hoops" not required by statute. *Wilderness Soc'y v. Tyrrel*, 918 F.2d 813, 818 (9th Cir. 1990). Instead, we only direct compliance with a procedure that *is* required, namely, the EIS requirement. To hold an agency to its statutory obligations is in no way similar to constructing a novel management plan requirement, *see Tyrrel*, 918 F.2d at 816 18, or insisting upon additional hearing procedures, *Vt. Yankee*, 435 U.S. at 540-42.

Moreover, as we explain below, we leave it up to BLM how to fulfill its obligation to take a "hard look," *Goodman*, 505 F.3d at 889, at the wilderness characteristics issue. Doing so will require some further work on the Bureau's part. Nonetheless, requiring the Bureau to fulfill its statutory duty to "consider every significant aspect of the environmental impact" of its actions, *Vermont Yankee*, 454 U.S. at 553, could not possibly implicate *Vermont Yankee*'s admonitions regarding judicially-created procedures.

### c.  The "Other Resources Considered" Argument

Finally, the BLM provides a laundry list of other resource values that it *did* consider, ranging from animal habitat quality to visual resources. Although it does not argue that its analysis of these other resources was identical to an analysis of wilderness characteristics, it contends that the analysis had the "incidental benefit of capturing the [Southeast Oregon Plan's] effects on many 'wilderness characteristics.' "[23] The BLM

---

[23]The BLM also suggests that it did not know there was a need for a new wilderness inventory because ONDA did not raise the issue during the initial scoping process for the Plan and EIS. But the question is not whether the BLM needed to conduct a full wilderness inventory under 43 U.S.C. § 1711 (although such an inventory may be appropriate). Such methodological questions are not at issue here. Instead, the question is whether the BLM was put on notice that it should address wilderness issues *at all*.

It clearly was. ONDA submitted extensive comments concerning wilderness values in response to the draft EIS, on the assumption that the

supposes, apparently, that members of the public and government decisionmakers might be able to piece together a wilderness characteristics analysis from what the Bureau did say. The BLM is wrong in several regards.

First, the BLM never advanced such a position in the EIS itself. While interpretations that are "first articulated in a legal brief [are] not categorically 'unworthy of deference,' " the BLM's argument is simply a " '*post hoc* rationalization advanced . . . to defend past agency action against attack.' " *Sacks v. Office of Foreign Assets Control*, 466 F.3d 764, 780 (9th Cir. 2006) (quoting *Auer v. Robbins*, 519 U.S. 452, 462 (1997) (second alteration in original)). "The short — and sufficient — answer" to the BLM's argument, therefore, "is that the courts may not accept appellate counsel's *post hoc* rationalizations for agency action." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50. "It is well established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *Id.* (citing, *inter alia*, *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

Moreover, the premises of the argument are wrong. Although the BLM suggests that "wilderness characteristics"

---

BLM could designate new WSAs, a power the BLM did not forego until later in the 2003 Utah settlement. ONDA also addressed the wilderness issue in its protest letter. All that is required of "[p]ersons challenging an agency's compliance with NEPA" is that they "structure their participation so that it . . . alerts the agency to the parties' position and contentions, in order to allow the agency to give the issue meaningful consideration." *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 965 (9th Cir. 2006) (quoting *Pub. Citizen*, 541 U.S. at 764 (second alteration in original)); *see also Nw. Res. Info. Ctr. v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1060, 1067 (9th Cir. 1995) (stating that an agency "cannot forever omit a factor from the scope of an EIS *solely* because the factor was not raised as a concern during the scoping process. An agency preparing an EIS has a duty to assess, consider, and respond to *all* comments, even those relating to environmental factors not mentioned during the scoping process.") (quoting *Or. Natural Res. Council v. Marsh*, 52 F.3d 1485, 1490 (9th Cir. 1995), emphases in original). ONDA met this requirement.

is a nebulous term, capable of being addressed simply by generally examining resources having to do with nature, that is not so. As we have discussed at length, "wilderness characteristics" is a carefully-defined statutory concept, originating in the Wilderness Act, incorporated into the BLM's mandate by the FLPMA, and used by the BLM in its own Handbook and by the IBLA in reviewing the BLM's actions. In *Smith*, the Forest Service similarly argued that roadlessness was "merely a synonym" for other resources that it *had* considered. 33 F.3d at 1078. We expressed some sympathy for the idea that it might be possible to address roadlessness by considering other factors, but explained that the Forest Service's analysis had never comprehensively analyzed the land at issue in that case and held that it had to "at the very least, . . . acknowledge the existence of the 5,000 acre roadless area" at issue in that case. *See id.* at 1078-79.

So here it is. Even had the BLM professed in the EIS to use such a consideration-by-proxy approach, it is far from clear that it would have provided adequate disclosure of any wilderness values potentially in the planning area.[24] And, in any event, the BLM never purported to have developed such a proxy methodology, by which consideration of other resource types could be melded together to produce an analysis of wilderness characteristics. Instead, it firmly maintained that, because of its § 1782 survey, it need not address the fate of non-WSA lands with wilderness characteristics at all.

---

[24]Clarity is at a premium in NEPA because the statute, as we have said, is a democratic decisionmaking tool, designed to "foster excellent action" by "help[ing] public officials make decisions that are based on [an] understanding of environmental consequences." 40 C.F.R. § 1500.1(c). An EIS, to fulfil its role as an "action-forcing device," *id.* § 1502.1, conducive to public analysis and agency reflection, must "be written in plain language . . . so that decisionmakers and the public can readily understand [it]." *Id.* § 1502.8; *see also Earth Island Inst.*, 442 F.3d at 1160 (characterizing § 1502.8 as requiring that NEPA documents be organized so as to be "readily understandable") (quoting *Or. Envtl. Council v. Kunzman*, 817 F.2d 484, 494 (9th Cir. 1987)).

Finally, this appeal does not, as the BLM contends, concern an issue of agency methodology. We are not asked to determine whether the particular methods the BLM devised to study or manage land with wilderness characteristics are appropriate. When reviewing questions of methodology and planning strategy, we would certainly accord the Bureau great deference, recognizing that NEPA's "requisite 'hard look' does not require adherence to a particular analytic protocol." *Ass'n of Pub. Agency Customers, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1188 (9th Cir. 1997). But no question of methodology with regard to the treatment of wilderness values on non-WSA lands in the planning area is before us. Here, the BLM used *no* method to analyze or plan for the management of such values. We cannot defer to a void.

### 5.  Conclusion on Wilderness Issues

In sum, the BLM misunderstood the role of wilderness characteristics in its land use planning decisions. Contrary to the understanding it expressed, wilderness characteristics are a value which, under the FLPMA, the Bureau has the continuing authority to manage, even after it has fulfilled its 43 U.S.C. § 1782 duties to recommend some lands with wilderness characteristics for permanent congressional protection. As a result, the BLM's completion of its permanent preservation recommendations for the planning area does not mean that the Bureau may entirely decline to consider wilderness characteristics presently existing in the area.

[10] ONDA drew the BLM's attention to the fact that, in some regions of the planning area not designated as WSAs when the BLM conducted its § 1782 survey prior to November 1980, wilderness characteristics may now be present. In view of the broad management purposes of the Southeast Oregon Plan, and the possibility that the Plan could affect wilderness values, ONDA requested that the BLM give some attention to the matter in its EIS. The BLM's management of any lands with wilderness characteristics is likely to be vigor-

ously debated. It is fairly debatable issues of this kind that NEPA was designed to bring out in the open, for analysis and discussion in the service of sound decisionmaking. The BLM's response to ONDA's concern — that it had completed the § 1782 survey and that it had no further duty to inventory or analyze wilderness characteristics as such — was wrong. It did not provide the "full and fair discussion" of the issue required by NEPA, and also did not properly respond to ONDA's comments.[25] *See* 40 C.F.R. §§ 1502.1, 1503.4.

[11] BLM must address in some manner in its revised EIS whether, and to what extent, wilderness values are now present in the planning area outside of existing WSAs and, if so, how the Plan should treat land with such values. We prescribe no particular methodology for that consideration. The BLM must, however, do more than simply assert that it need not consider wilderness values because of the completion of the § 1782 process, as it did in the present EIS. We therefore remand to the district court.

## C. The Alternatives Analyses

ONDA's two other NEPA arguments concern the scope of the BLM's alternatives analyses for grazing and ORV management. "The 'touchstone' for courts reviewing challenges to an EIS under NEPA 'is whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." *Westlands Water*, 376 F.3d at 872 (quoting *Block*, 690 F.2d at 767). An EIS "cannot be found wanting simply because the agency failed to include every alternative device thought conceivable by the mind of

---

[25]This holding also addresses ONDA's contention that the BLM failed adequately to consider the Southeast Oregon Plan's cumulative impacts on lands with wilderness characteristics. Because the BLM did not consider impacts on lands with wilderness characteristics at all, it also did not consider cumulative impacts on any such lands. It should do so, as appropriate, on remand.

man." *Vt. Yankee*, 435 U.S. at 551. Still, "[t]he existence of a viable but unexamined alternative renders an environmental impact statement inadequate." *Westlands Water*, 376 F.3d at 868 (quoting *Morongo Band*, 161 F.3d at 575).

## 1. Grazing Alternatives

In land use plans, the BLM must "establish allowable [grazing] resource uses . . . , related levels of production or use to be maintained, areas of use, and resource condition goals and objectives to be obtained." 43 C.F.R. § 4100.0-8. "The plans also set forth program constraints and general management practices needed to achieve management objectives." *Id.* The Southeast Oregon Plan, as a result, sets the basic pattern of grazing uses on its lands well into the future.[26]

ONDA argues that the BLM erred by considering only one option it deemed viable — Alternative D2 — that would significantly shift the balance away from grazing on the public lands that it manages.[27] We have previously invalidated the EIS of a federal land management strategy which did not consider alternatives that sufficiently explored the "trade-off between wilderness use and development." *Block*, 690 F.2d at 767. In *Block*, the Forest Service failed to consider allocating more than a third of surveyed acreage in California to wilderness, although it considered a wide range of less protective uses of the land. *See id.* at 765-67. We held that this skewing effect was "profound," because the Service had "uncritically assume[d] that a substantial portion of the . . . areas should be developed and consider[ed] only those alternatives with that

[26]The record demonstrates that grazing has major landscape-level impacts: Cattle may transport invasive species, trample stream banks and wetlands, and crush living soil crusts vital to dryland plants. Moreover, ranching activities naturally are attended by fences, water tanks, and other construction projects, which can impair wilderness characteristics.

[27]Such a reduction in grazing pressure could be accomplished in several ways — for example by decreasing AUMs on such lands, excluding them from grazing altogether, or taking some other protective measure.

end result." *Id.* at 767; *see also Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 812-14 (9th Cir. 1999) (rejecting a Forest Service alternatives analysis which failed to "even consider[ ]" more protective land use options).

**[12]** We need not and do not now decide whether there is a similar deficiency with regard to the grazing alternatives considered in this case. Our remand on the wilderness issue may well, depending on the BLM's analysis of whether lands with wilderness values are present and affected by the Plan, lead the BLM to consider reducing grazing pressure on any such lands. Because the resolution of the wilderness issue may, then, address the bias towards grazing which ONDA perceives in the present EIS, we do not resolve that matter now.

## 2.   ORV Alternatives

There is no dispute that ORVs profoundly change the lands across which they travel. The effects of the Plan's approval of ORV designations are immediate and sweeping, because "[t]he approval of a resource management plan . . . constitutes formal designation of off-road vehicle use areas." 43 C.F.R. § 8342.2(b). In addition to the physical impact of motorized vehicles on natural features of land, such vehicles transform remote areas into motorized recreation zones, substantially altering the outdoor recreation experiences of ORV users and non-users alike. As a result, the BLM describes itself as "increasingly concerned about the impact of all types of recreational activities, including motorized [ORV] use, on the . . . public land resources for which it provides stewardship." BUREAU OF LAND MANAGEMENT, U. S. DEP'T OF THE INTERIOR, NATIONAL MANAGEMENT STRATEGY FOR MOTORIZED OFF-HIGHWAY VEHICLE USE ON PUBLIC LANDS 1 (2001). Striking the proper balance with regard to ORV use is thus of considerable importance to the BLM's land management planning. In this instance, the BLM in several respects failed to consider alter-

natives that would have allowed the Bureau and the public fairly to consider the options.

First, as in its grazing analysis in the present EIS, the BLM did not consider the impact of ORV designations on any lands with wilderness values in the planning area. If such lands are determined to be present on remand, that decision could well affect the BLM's consideration of ORV management alternatives with regard to them.

The ORV analysis is also flawed, however, for a reason independent of wilderness issues: It considered no alternative that proposed closing more than a fraction of the planning area to ORV use, as opposed to merely designating areas for "limited" use. As ONDA observes, the BLM did not consider any alternative that would have closed more than 0.77% of the planning area to ORVs. Indeed, every alternative would have reduced the extent of closed areas from that in effect previously. It is precisely this sort of "uncritical[ ]" privileging of one form of use over another that we have held violates NEPA. *See Block*, 690 F.2d at 767. Closures, not just "limited" designations, must be considered to comply with NEPA.

The BLM nonetheless maintains that its analysis of ORV designations is adequate because it considered a wide range of use allocations between open and limited ORV designations, and because it could implement emergency closures if necessary. We disagree. Limited ORV use is simply not identical to no ORV use. A limited designation, even with the possibility of closure, does not provide protection equivalent to a straightforward closure.

Specifically, the limitations contemplated in the EIS fall into basically two types: seasonal closures of some areas and limitations to existing routes. Even with such limitations in place, ORV users may venture off trail by as much as 150 feet to find a camping site, thereby creating ORV tracks as long as a football field criss-crossing existing routes. As they pass

through "limited" areas, both on existing routes and en route to camping sites, ORVs will still churn up mud, transport mud and seeds into the regions through which they pass, and will still significantly affect the outdoor recreation experience. That the BLM might then — once the damage has been done — implement an emergency closure does not render this form of management substantially identical to an initial closure.

**[13]** In sum, the BLM must consider closures of significant portions of the land it manages, including, if found appropriate on remand, lands with wilderness characteristics.

## III.   Conclusion

The EIS violated NEPA in the ways we have stated. Having addressed the problems we have identified, the BLM may decide to make different choices. NEPA is not a paper exercise, and new analyses may point in new directions. As a result, although ONDA also raises concerns regarding alleged substantive and procedural flaws within the Plan, we do not reach those issues today. The problems it identifies may never arise once the BLM has had a chance to see the choices before it with fresh eyes.

**REVERSED and REMANDED.**